**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF CONNECTICUT**
**BRIDGEPORT DIVISION**

_____X
In re:                                      :
                                            :
Derby Development Corp.,                    :     Chapter 11
                                            :     Case No.: 10-50259
         Debtor.                            :
_____X

*Appearances:*

| | | |
|---|---|---|
| Peter L. Ressler, Esq.<br>Groob Ressler & Mulqueen<br>123 York Avenue, Suite 1B<br>New Haven, CT | : | For the Debtor |
| Patrick M. Birney, Esq.<br>Martin A. Onorato, Esq.<br>Robinson & Cole, LLP<br>280 Trumbull Street<br>Hartford, CT | : | For Community Preservation Corporation |
| Nicole L. Micklich, Esq.<br>Garcia & Milas<br>44 Trumbull Street<br>New haven, CT | : | For Mario Paniccia |
| Anthony J. LaBella, Esq.<br>Bishop, Jackson & Kelly, LLC<br>472 Wheelers Farm Road<br>Milford, CT | : | For Viking Acquisitions, LLC |

**MEMORANDUM OF DECISION AND ORDER ON**
**CREDITOR CPC'S § 1126(E) MOTION**

## Introduction

Secured creditor Community Preservation Corporation ("CPC") moves to have the vote of Viking Acquisition, LLC ("Viking") disregarded in the voting on the Debtor's Amended Chapter 11 Plan (hereafter, the "§ 1126(e) Motion"; *see* ECF No. 102). Mario Paniccia ("Mario"), the original holder of the Class 2 Claim, objects. Viking, the current holder of the Class 2 Claim, joins Mario's objection, as does the Debtor. For the reasons that follow, CPC's § 1126(e) Motion is granted.

## Background

This "Background" is based on the parties' "Stipulation of Facts" (*see* ECF. No. 182; hereafter, "Stipulation") submitted in connection with the evidentiary hearing on CPC's § 1126(e) Motion, and the evidence admitted at that hearing.

### *Debtor's Bankruptcy Filing – Generally*

Derby Development Corporation ("Debtor") commenced this Chapter 11 bankruptcy case on February 5, 2010. On that date David Paniccia ("David") was, and he still is, the President of the Debtor. The Debtor owns real property in Derby, Connecticut, which consists of a building with approximately 15 residential rental units (hereafter, the "Property"). The Debtor listed on its "Schedule D - Creditors Holding Secured Claims", among others, CPC and Mario as holders of secured claims. (*See* ECF. No. 19 at 8.) Mario is David's uncle and an architect who provided services to the Debtor. Schedule D also listed CPC as having a claim of $1,575,000 secured by a mortgage on the Property and Mario as having a claim of $160,000 secured by a $410,000 (face value) mechanic's lien ("Mechanic's Lien") on the Property. On Schedule D, the Property was stated to have a value of $900,000. (*See id.*)

CPC filed a proof of claim for $1,765,624.30, of which $1.23 million was secured and $535,624.30 was unsecured. (*See* Claims Register, Claim No. 2.) Mario did not file a proof of claim.

***Debtor's Disclosure Statements and Plans***

The Debtor's First Amended Disclosure Statement listed four classes:

**Class 1**: CPC's *impaired* secured claim of $1,765,624, as to which the Debtor stated an intention to seek a § 506 determination of the amount of CPC's secured and unsecured claims. The unsecured portion was to be to added to Class 3;

**Class 2**: Mario's *impaired* secured claim in the amount of $160,000, which would be "paid in accordance to terms agreed upon by the parties";

**Class 3**: The General Creditors' i*mpaired* unsecured claims, which would be paid a 10% dividend; and

**Class 4**: David's insider interest in the Debtor, which would be retained "in exchange for contributing monies necessary for the Debtor to fund its obligations under the Plan."

(First Amended Disclosure Statement, ECF No. 79 at 7-8.)

The First Amended Disclosure Statement was approved on April 5, 2011 (*see* ECF Docket Entry dated April 5, 2011). The deadline to file objections to confirmation of the Debtor's First Amended Plan ("1st Plan") and cast ballots was set for May 5, 2011. The court set a status conference regarding objections to confirmation for May 15, 2011.

On May 5, 2011, CPC submitted a Class 1 ballot rejecting the 1st Plan and a Class 3 ballot rejecting the 1st Plan. It is undisputed that CPC controls Class 3. On that date, CPC also filed an objection to the 1st Plan. At the May 15, 2011 status conference,[1] CPC stated that the Debtor could not confirm the 1st Plan because it could not obtain an impaired accepting class of non-insiders since Mario is an insider of the

---

[1] The status conference was continued to May 16, 2011.

Debtor.  *See* 11 U.S.C. § 101(31)(B)(vi) (defining an insider as a "relative" if, as here, the debtor is a corporation); *see also* § 101(45) (defining "relative").  The Debtor's counsel stated that Mario sold or was selling his claim to Viking.  (*See, infra*, 4-6 for further discussion regarding Viking.)  At the conclusion of the status conference, the court extended the ballot and objection deadlines to May 31, 2011.

Some time before the May 31st deadline, Viking cast an undated ballot in favor of the Debtor's 1st Plan.  That ballot listed the value of the Class 2 claim, *i.e.*, the Mechanic's Lien, at $160,000.  On July 6, 2011, CPC moved to have Viking's ballot disregarded.  (*See* ECF No. 102.)

On August 23, 2011, the Debtor filed a "Second Amended Disclosure Statement" (ECF No. 123) and a "Second Amended Plan" (ECF No. 124).  On November 16, 2011, they were superceded by the Debtor's "Third Amended Disclosure Statement" (ECF No. 129) and "Third Amended Plan" (ECF No. 130; "3rd Plan").  Both the Second and Third Amended Disclosure Statements proposed the identical treatment for Class 2, *i.e.*, the is class "composed of the impaired secured claim of Viking Acquisitions, LLC in [the] amount of $410,000.00," and the claim "will be paid according to terms agreed upon by the parties." (ECF. No. 123 at 8; ECF No. 129 at 8.)

### *Viking Acquisitions, LLC*

Viking is a Connecticut, single-member limited liability company.  It was created on May 17, 2011, and its only asset is the Mechanic's Lien.  Viking's sole member is Samuel Mogilner ("Mogilner"), who is a close college friend of David.  (See Stipulation

at ¶¶ 24, 25, 27.) Mogliner played no role in the creation of Viking. Rather, Mario prepared and filed all the necessary legal documents to create Viking and to obtain its tax identification number. Moreover, Mario chose to use a Fairfield, Connecticut United Parcel Service (UPS) store as the address for Viking's headquarters. Mario also used the UPS store address on Viking's organizational documents as Mogilner's residential address. This was done without Mogilner's knowledge and despite the fact that Mogilner resides in Brooklyn, New York.

Further, Mogilner is a marketing professional with no prior experience in creating business entities. The evidence demonstrates that after meeting with Mario, Mogilner became interested in purchasing the Mechanic's Lien. With no knowledge regarding the architectural services that Mario claims he provided to the Debtor and that form the basis of the Mechanic's Lien; with no review of the Debtor's bankruptcy schedules, disclosure statements or plans; and despite the Mechanic's Lien having been valued at $160,000 in the Debtor's bankruptcy schedules, Viking, *i.e*, Mogilner, agreed to purchase the Mechanic's Lien for $300,000. Moreover, there is nothing in the record to suggest that Mario performed any due diligence as to Mogilner's financial ability to fund Viking's purchase of the Mechanic's Lien. Nonetheless, the day after its May 17th creation, Viking entered into an agreement with Mario for a structured purchase of the Mechanic's Lien, under which Viking agreed to make a $5,000 down payment, provide $75,000 worth of marketing services to Mario, and finance the $220,000 balance.

Of the $5,000 down payment, $500 was a cash payment at the May 18th closing, with the $4,500 balance supposedly having been paid with a bank check two months later and which Mario claims to have cashed. As of February 16, 2012, nine months

after its formation, Viking had not provided Mario with any marketing services. Further, there has not been compliance with the terms of the time promissory note ("Note") from Viking to Mario, which memorialized the parties' financed portion of the purchase. Under the Note's terms, *inter alia*: (1) Viking was to pay Mario 120 monthly payments of $2,458.33, commencing January 1, 2012; (2) if two consecutive payments were not timely made, Viking would be in default; and (3) if Viking defaulted, Mario had the unfettered right to retake the Mechanic's Lien. Viking did not make the January 2012 or February 2012 payments, rendering it in default and triggering Mario's right to retake.

As stated, *supra*, at 4, prior to the May 31, 2011 voting deadline, Viking cast an undated ballot in favor of the Debtor's 1st Plan. Mogilner claims he has no knowledge or recollection regarding casting of that ballot or that the ballot stated that the value of Class 2 claim was $160,000.

### *CPC's Competing Disclosure Statement and Plan*

On December 20, 2011, CPC filed a competing disclosure statement and a proposed plan of liquidation. (*See* ECF No. 152 (disclosure statement); ECF No. 151 (plan).) On February 22, 2012, the court approved CPC's disclosure statement, as well as the Debtor's Third Amended Disclosure Statement. However, no confirmation hearing date was scheduled, as the court ruled that the most efficient way to proceed was to first determine CPC's § 1126(e) Motion. Accordingly, the court set a briefing schedule and scheduled an evidentiary hearing for March 21, 2012.

## Discussion

The predicate for the court's analysis is § 1129(a)(10):

(a) The court shall confirm a plan *only if all* of the following requirements are met:
* * *
(10) If a class of claims is impaired under the plan, at least one class of claims that is impaired under the plan has accepted the plan, determined without including any acceptance of the plan by any insider.

11 U.S.C. § 1129(a)(10) (emphasis added). CPC argues that the creation of Viking and the transfer of Mario's Class 2 Claim to Viking was orchestrated to convert Mario's insider claim to a non-insider claim for purposes of confirming the Debtor's plan. By way of a § 1126(e) designation, CPC seeks to have Viking's acceptance of the Debtor's 1st Plan disregarded, thereby leaving the Debtor with no class of claims that is impaired, but accepting its plan. With this result, CPC argues that the Debtor's 1st Plan is not confirmable as a matter of law.[2]

Section 1126(e) provides courts with the authority to "designate any entity whose acceptance or rejection of such plan was not in good faith . . . ," § 1126(e), such that the vote is "disregard[ed]". *See Dish Network Corp. v. DBSD No. America, Inc. (In re DBSD No. America Corp.)*, 634 F.3d 79, 101 (2d Cir. 2011)*; In re Adelphia Commn's Corp.*, 359 B.R. 54, 56 n.2 (Bankr. S.D.N.Y. 2006) ("'designate' is a word of art in bankruptcy parlance, meaning, in essence, 'disqualify'"). "The Code provides no guidance about what constitutes a bad faith vote to accept or reject a plan. Rather, § 1126(e)'s 'good faith' test effectively delegates to the courts the task of deciding when a party steps over the boundary." *Dish Network v. DBSD*, 634 F.3d at 101.

---

[2] That argument applies equally to the Debtor's Second Amended Plan and its Third Amended Plan.

In reaching such a conclusion, the Second Circuit has recently cautioned:

> [m]erely purchasing claims in bankruptcy for the purpose of securing the approval or rejection of a plan does not of itself amount to "bad faith"  Nor will selfishness alone defeat a creditor's goof faith; the Code assumes that parties will act in their own self interest and allows them to do so.  [Rather, §] 1126(e) comes into play when voters venture beyond mere self-interested promotion of their claims.  [T]he section was intended to apply to those who were not attempting to protect their own proper interests, but who were, instead, attempting to obtain some benefit to which they were not entitled.

*Id.* at 102 (internal quotations and citations omitted).  Thus, the Second Circuit instructs bankruptcy courts to determine whether the voter has an "'ulterior motive,' that is, with 'an interest other than an interest as a creditor'".  *Id.* at 102 (quoting *In re P-R Holding Corp.*, 147 F.2d 895, 897 (2d Cir. 1945), other internal quotations omitted); *see also Young v. Higbee Co.*, 324 U.S. 204, 211 (1945), and whether the entity "voted with such an impermissible motive." *Dish Network v. DBSD*, 634 F.3d at 102  "Whether a vote has been properly designated is a fact-intensive question that must be based on the totality of the circumstances, according considerable deference to the expertise of bankruptcy judges."  *Id.* at 105.

In that context, the court finds from the evidence adduced at trial, *see, supra*, "Background", that Viking (*i.e.*, Mogilner, the close friend of David), was not acting for its own interest as a creditor, but rather to advance the Debtor's (*i.e.*, David's) interest.  The establishment of Viking and its purchase of Mario's Mechanic's Lien was a sham intended to facilitate the confirmation of the Debtor's over CPC's objections.  To be more specific, Viking (through Mogilner) agreed to purchase the Mechanic's Lien and vote in favor of the Debtor's 1st Plan, free from Mario's insider status, and thereby

supply a non-insider vote by an impaired class to satisfy § 1129(a)(10).

The cumulative weight of the following evidence supports that finding: (1) the timing of the formation of Viking; (2) the fact that David's close friend, Mogilner, is the sole member of Vicking; (2) the formation of Viking by Mario, coupled with Mogilner's non-involvement; (3) Mogilner's lack of due diligence in causing Viking to purchase the Mechanic's Lien for $300,000 when it was originally valued at $160,000 in the Debtor's schedules; (4) Mogilner's lack of knowledge regarding the casting of Viking's ballot, especially when that ballot identified Viking's Class 2 claim as being for $160,000, despite the Mechanic's Lien having a face value of $410,000; (5) Viking's non-performance of the purchase terms (*e.g.*, failing to provide any marketing services to Mario); and (6) Mario's lack of due diligence regarding Mogilner's financial ability to close the transaction when agreeing to sell the Mechanic's Lien to Viking. That conclusion is buttressed by the evidence that Viking jeopardized its retention of the Mechanic's Lien by failing to make required payments on the Note so that Mario would have, and indeed he now has, an unfettered right to the Mechanic's Lien.

## Conclusion

For the foregoing reasons, IT IS ORDERED that CPC's § 1126(e) Motion is granted. This Memorandum of Decision constitutes the court's findings of fact and conclusions of law in accordance with Bankruptcy Rule 7052(a)(1).

Dated this 27th day of June, 2012 in Bridgeport, Connecticut.

BY THE COURT

Alan H. S. Shiff
United States Bankruptcy Judge